## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| **RANCE C. BEST, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 2:12CV7 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Rance C. Best, Jr. for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act.  This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28 U.S.C. § 636(c).  Plaintiff filed a Brief in support of the Complaint.  (Doc. No. 18).  Defendant filed a Brief in Support of the Answer.  (Doc. No. 21).

### Procedural History

On July 15, 2009, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on June 4, 2009.  (Tr. 117-23).  This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated October 14, 2011.  (Tr. 65-75, 12-25).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social

Security Administration (SSA), which was denied on November 30, 2011.  (Tr. 6, 1-5).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

**A.**    **ALJ Hearing**

Plaintiff's administrative hearing was held on April 12, 2011.  (Tr. 32).  Plaintiff was present and was represented by counsel.  (Id.).  Also present was vocational expert Denise Waddell.  (Id.).

Plaintiff's attorney made an opening statement in which she argued that plaintiff met Listing 12.05C based on his low IQ scores and his physical impairments.  (Tr. 35-36).

The ALJ examined plaintiff, who testified that he was forty-seven years of age and lived with his fiancé and his nine-year-old son.  (Tr. 37).  Plaintiff stated that the last grade he finished in school was the eighth grade.  (Id.).  Plaintiff testified that he had not received any vocational training or education since that time.  (Tr. 38).

Plaintiff stated that his only occupation for the past fifteen years was that of a dry wall taper and finisher.  (Id.).  Plaintiff testified that he worked during part of 2009.  (Id.).  Plaintiff stated that he keeps trying to work, and that he is only able to work if someone helps him.  (Id.).

Plaintiff testified that he last worked in October of 2010.  (Tr. 39).  Plaintiff stated that he earned approximately $5,000.00 in 2010.  (Id.).  Plaintiff testified that he stopped working in October 2010 because he needed a break due to his neck and back pain.  (Id.).

Plaintiff's attorney examined plaintiff, who testified that he experiences neck pain that goes down his back and into his shoulders.  (Tr. 40).  Plaintiff stated that he has difficulty moving

- 2 -

his head.  (Id.).  Plaintiff testified that he experiences pain when he looks up or turns too far

sideways.  (Id.).  Plaintiff stated that he also experiences neck pain when he bends over to pick up

items, such as a gallon of milk.  (Id.).

Plaintiff testified that he was able to stand still for about thirty minutes, and walk for about

one mile.  (Tr. 41).  Plaintiff stated that his biggest limitation is with regard to the motion of his

neck and lifting.  (Id.).

Plaintiff testified that he was placed in special education when he was in school because he

had learning difficulties.  (Tr. 41-42).  Plaintiff stated that his reading and writing skills are "not

very good."  (Tr. 42).  Plaintiff testified that his nine-year-old son can read and write better than

him.  (Id.).  Plaintiff stated that he does not know how to use a computer.  (Id.).

Plaintiff testified that he has not undergone neck surgery since 2009 due to lack of

finances.  (Id.).  Plaintiff stated that he receives treatment for his neck impairment at Family

Healthcare.  (Id.).  Plaintiff testified that his doctor prescribes Vicodin[1] and Amitriptyline[2] for his

neck pain.  (Id.).

Plaintiff stated that he drinks "a little alcohol" to help him relax.  (Tr. 43).  Plaintiff

testified that the Vicodin does not help as much as it used to.  (Id.).

Plaintiff stated that he used marijuana to cope with his pain before he was prescribed pain

medication.  (Id.).  Plaintiff testified that he had not used marijuana for "a few months."  (Id.).

Plaintiff stated that his doctor prescribes depression medications to help him relax and

---

[1]Vicodin is indicated for the relief of moderate to moderately severe pain.  See Physician's Desk Reference (PDR), 529 (63rd Ed. 2009).

[2]Amitriptyline is indicated for the treatment of mood disorders including depression.  See WebMD, http://www.webmd.com/drugs (last visited March 5, 2013).

sleep.  (Tr. 44).

Plaintiff testified that he has difficulty controlling his anger.  (Id.).  Plaintiff stated that he has difficulty getting along with people, and would have difficulty getting along with co-workers. (Tr. 44-45).

Plaintiff testified that he has difficulty concentrating due to his pain.  (Tr. 45).

Plaintiff stated that he does not read well so he would have difficulty reading instructions for a job.  (Id.).  Plaintiff testified that he would do better if someone gave instructions to him orally.  (Id.).

Plaintiff stated that he does not have difficulty reaching in front of him.  (Id.).  Plaintiff testified that he has difficulty lifting overhead due to the effect it has on his shoulders.  (Tr. 46). Plaintiff stated that he was unable to do the overhead lifting required to perform his past work. (Id.).

Plaintiff testified that, after he works for a period, he experiences a lot of pain for a couple of months.  (Id.).

The ALJ then re-examined plaintiff, who testified that he cooks approximately once a week.  (Tr. 46).  Plaintiff stated that he does not do any household chores other than taking out the trash, and occasionally helping with the laundry.  (Tr. 47).  Plaintiff testified that he does yard work, and that he mows the grass once a week.  (Id.).

Plaintiff stated that he drives a vehicle, and that he drives approximately every other day. (Id.).  Plaintiff testified that he drives his fiancé to the store, and drives to work.  (Tr. 48). Plaintiff stated that he occasionally drives places alone, although someone is usually with him. (Id.).  Plaintiff testified that he does not shop, and that he only goes inside stores every couple of

- 4 -

months.  (Id.).

Plaintiff stated that he enjoys fishing and hunting as hobbies.  (Id.).  Plaintiff testified that he took his son hunting and fishing the weekend before the hearing.  (Id.).  Plaintiff stated that he had not gone hunting or fishing for several months prior to that.  (Tr. 49).

Plaintiff testified that he watches television and lies around during the day.  (Tr. 49). Plaintiff stated that he does stretching exercises to help his lower back two to three times a week. (Id.).  Plaintiff testified that he goes out to visit friends "every once in a while."  (Id.).  Plaintiff stated that he goes out to eat occasionally, and that he had last gone out to eat several months prior to the hearing.  (Tr. 50).

Plaintiff testified that he was able to count change.  (Id.).  Plaintiff stated that he does not have a saving or checking account, and that he did not know whether he could balance an account.  (Id.).  Plaintiff testified that he does not pay bills.  (Id.).  Plaintiff stated that he has a cellular phone but he does not know how to text.  (Tr. 51).

Plaintiff testified that he had to take his driver's license test multiple times before he passed it.  (Id.).  Plaintiff stated that he has been involved in an automobile accident, and that it was the other driver's fault.  (Id.).  Plaintiff testified that he has been issued tickets for speeding, but he has never lost his license.  (Id.).

Plaintiff's attorney re-examined plaintiff, who testified that he gets out of bed every day and showers daily.  (Tr. 52).

The ALJ then examined vocational expert Denise Waddell, who testified that plaintiff's past work is defined as drywall finisher, and it is classified as very heavy and skilled, with an SVP of 7.  (Tr. 53).

The ALJ asked Ms. Waddell to assume a hypothetical claimant with plaintiff's background and the following limitations: able to perform the exertional requirements of light work; can only occasionally climb ramps and stairs, balance and stoop, kneel, crouch, and crawl; should never climb ropes, ladders, or scaffolds; no overhead work; can understand, remember, and carry out simple instructions; can make simple work-related decisions; can deal with occasional changes in work processes and environment; should have no contact with the general public; and, although not necessarily working in isolation, should work with things rather than people, and should have only superficial or incidental work-related type contact with co-workers and supervisors.  (Tr. 54).  Ms. Waddell testified that the individual could perform light, unskilled work, with SVPs of 2, such as inserting machine operator (43,200 positions nationally, 1,300 in Missouri); bench assembler (100,500 positions nationally, 2,700 in Missouri); and connector assembler (59,400 positions nationally, 1,200 positions in Missouri).  (Tr. 54-55).  Ms. Waddell testified that all three of these positions could be learned through demonstration and verbal instructions.  (Tr. 55).  Ms. Waddell stated that no reading is required as an essential part of performing the job.  (Id.).

Ms. Waddell testified that adding a sit/stand option would have no impact on the individual's ability to perform the three jobs she described.  (Id.).

Ms. Waddell stated that the individual would be able to perform the inserting machine operator job if he had an additional limitation of only occasionally turning his head from side to side.  (Id.).  Ms. Waddell testified that the individual could also perform jobs of folding machine operator (46,300 positions nationally, 1,700 in Missouri); and collator operator (29,000 nationally, 1,100 in Missouri).  (Tr. 55-56).

Ms. Waddell testified that the individual would be unable to perform any jobs if he would

miss at least two days of work each month.  (Tr. 56).

Plaintiff's attorney next examined Ms. Waddell who testified that, with regard to the three jobs she described earlier, there would be a period of thirty days of instruction to learn the job, after which the employer would not tolerate ongoing instruction and supervision.  (Id.).

**B.**     **Relevant Medical Records**

In 1974, at the age of eleven, plaintiff's school administered the Wechsler Intelligence Scale for Children, which revealed a verbal IQ of 75, performance IQ of 69, and a full scale IQ of 70.[3]  (Tr. 200).  It was noted that plaintiff was of limited intellectual ability and was referred as having a learning problem.  (Tr. 201).  Plaintiff exhibited some characteristics of the culturally disadvantaged such as slowness of cognitive tasks, deficient auditory attention and interpretive skills, deficient communicative skills, inadequate vocabulary, and below average skills in the basic academic areas.  (Id.).  It was recommended that plaintiff be placed in the district's program for children who are educably mentally retarded.  (Id.).

Plaintiff underwent an MRI of his cervical spine on November 3, 2003, which revealed degenerative changes of the cervical spine with mild narrowing of the central spinal canal and left neural foramen at C5-6.  (Tr. 270-71).  Plaintiff also underwent an MRI of his thoracic spine, which revealed mild degenerative changes at the mid to lower thoracic spine.  (Tr. 273).

In a letter dated February 18, 2004, Stephanie Reid-Arndt, Ph.D, Clinical Assistant Professor and Director of Adult Neuropsychology at the University of Missouri-Columbia stated that plaintiff underwent an assessment, which revealed variable memory functioning and

---

[3]Mild mental retardation is characterized by an IQ score of 50-55 to approximately 70. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 40 (4th Ed. 1994).  Borderline intellectual functioning is characterized by an IQ score in the 71 to 84 range.  See id. at 684.

impairments in verbal fluency and cognitive processing speed.  (Tr. 264).  Dr. Reid-Arndt stated

that, in contrast, plaintiff demonstrated generally intact attention, cognitive flexibility, visual

problem solving, and visual-spatial perception.  (Id.).  Dr. Reid-Arndt stated that plaintiff's

cognitive difficulties were consistent with his history of a mild traumatic brain injury and were

likely exacerbated by his experience of chronic shoulder pain.  (Id.).  Dr. Reid-Arndt

recommended that plaintiff consider modifying his weekly work schedule so that he allows himself

adequate time to rest.  (Id.).  Dr. Reid-Arndt noted that plaintiff reported that he has a full-time

job and that he also runs his own business during the evenings and weekends.  (Id.).  Dr. Reid-

Arndt indicated that plaintiff may need additional time to complete unfamiliar and/or more

complex tasks.  (Tr. 265).

Plaintiff underwent an x-ray of the cervical spine on June 15, 2007, which revealed

degenerative discs at C5-6.  (Tr. 268).  Plaintiff underwent an MRI of the cervical spine on June

30, 2007, which revealed spondylosis[4] with annular bulge, subannular tear, and foraminal

encroachment most pronounced at the C5-6 level.  (Tr. 267).

Plaintiff presented to Denise Barba, M.D. at Family Health Center of Boone County on

March 20, 2009, with complaints of neck pain that radiates to his shoulders bilaterally, and down

to his lower back.  (Tr. 206).  Plaintiff reported that he had herniated discs.  (Id.).  Plaintiff was

taking Vicodin daily, and was not doing his neck or back exercises.  (Id.).  Plaintiff was also

taking Amitriptyline at bedtime.  (Id.).  Upon examination, Dr. Barba noted no cervical or lumbar

spine tenderness, and normal mobility and curvature of the cervical and lumbar spine.  (Tr. 207).

---

[4]Ankylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a
degenerative nature.  See Stedman's Medical Dictionary, 813 (28th Ed. 2006).

Dr. Barba's assessment was back pain and neck pain. (Id.). Dr. Barba explained to plaintiff that he did not have herniated discs, and that his back imaging looked good. (Id.). Dr. Barba explained to plaintiff the risks of narcotics, and planned to taper plaintiff off Vicodin. (Id.). Dr. Barba continued the Amitriptyline, to be taken at bedtime. (Id.).

Plaintiff presented to Sharon Carmignani, M.D. at Family Health Center of Boone County on June 17, 2009, with continued complaints of neck pain. (Tr. 203). Plaintiff had been working as a drywall worker, which involves standing on a ladder and working with his hands over his head, looking towards the ceiling. (Id.). Plaintiff reported that this work aggravated his neck pain. (Id.). Plaintiff indicated that his disability claim had been denied, and he requested that Dr. Carmignani complete forms for his appeal. (Id.). Upon examination, plaintiff had good range of motion of the cervical spine, and normal upper extremity muscle mass, bulk, and tone. (Id.). Dr. Carmignani's assessment was cervicalgia.[5] (Id.). Dr. Carmignani stated "[h]e does need a different occupation other than drywalling because of the continued problems with his neck. I do not think he is disabled from all work, however I will fill out his papers, and he will come back to this clinic." (Id.).

Stanley Hutson, Ph.D, a state agency psychologist, completed a Psychiatric Review Technique on November 6, 2009, in which he expressed the opinion that plaintiff had no medically determinable impairment. (Tr. 208).

Plaintiff presented to Garth S. Russell, M.D., at Columbia Orthopaedic Group, for an evaluation on November 11, 2009. (Tr. 219-27). Plaintiff reported that he was involved in an automobile accident in September 2003, which resulted in severe neck pain. (Tr. 219). Plaintiff

---

[5]Neck pain. See Stedman's at 351.

indicated that he had worked consistently for thirty years as a drywaller prior to his injury, and he has attempted to return to this work on several occasions but had difficulty performing the work due to his neck pain.  (Tr. 220).  Dr. Russell noted that plaintiff became depressed and that he was currently taking Prozac.[6]  (Id.).  Plaintiff complained of neck pain and stiffness, going into his shoulders and down into his mid back.  (Id.).  Plaintiff also reported headaches, and chronic depression.  (Id.).  Upon physical examination, plaintiff was well-developed, well-nourished, and appeared to be somewhat depressed.  (Tr. 221).  Plaintiff was able to get up from the chair by pushing himself with his arms, and he walked with a slight limp on the right side in the area where he had a previous fracture.  (Id.).  Plaintiff was able to heel and toe walk without difficulty.  (Id.).  Dr. Russell noted chronic muscle spasm in the paracervical area of mild to moderate severity. (Id.).  Plaintiff had ten percent loss of the normal range of motion in the shoulders in external and internal rotation, flexion, and extension because of tightness of the musculature of the shoulders; and a loss of twenty degrees of abduction.  (Id.).  Dr. Russell noted some weakness in extension of the elbows bilaterally, which appeared to be due to triceps atrophy and weakness; however he did have a reflex in the triceps muscle bilaterally.  (Tr. 221-22).  Plaintiff's left upper extremity weakness appeared to be symmetrical and bilateral.  (Tr. 222).  Further examination of plaintiff's neck revealed forty degrees of rotation to the right and to the left; ten degrees of lateral deviation with ten degrees of hyperextension and forty-five degrees of flexion.  (Id.).  Plaintiff's straight leg raising was negative and there was no evidence of nerve root pressure in the lower extremities. (Id.).  Dr. Russell noted that x-rays of the thoracic spine revealed some degenerative changes and

---

[6]Prozac is an antidepressant drug indicated for the treatment of major depressive disorder. See PDR at 1854.

facet joint enlargements. (Id.). X-rays of the cervical spine suggest the presence of chronic muscle spasm; and reveal severe degenerative disease between C5 and C6 with anterior and posterior spondylosis. (Id.). Dr. Russell noted that there was marked restriction of motion in flexion/extension. (Id.). The foramina show encroachment bilaterally. (Id.). Dr. Russell diagnosed plaintiff with acute and chronic cervicothoracic strain and herniated disc C5-6 left; radiculopathy[7] C6 nerve root left with chronic weakness; reactive depression, chronic, moderately severe, requiring continued treatment; and traumatic brain syndrome Type I with memory loss. (Tr. 226). Dr. Russell expressed the opinion that plaintiff's 2003 accident caused his herniated disc. (Id.). Dr. Russell stated that, in spite of continued treatment including physical therapy, medications, manipulations, and steroid injections, he continues with moderate symptoms and evidence of significant physical impairment of his neck. (Id.). Dr. Russell stated that plaintiff is unable to look up consistently or turn from side to side, and that his symptoms are permanent. (Tr. 226-27). Dr. Russell stated plaintiff will "continue with the stiffness, pain, soreness based upon activity of extensive use of his neck or upper back." (Tr. 227). Dr. Russell indicated that plaintiff's memory loss secondary to his traumatic brain syndrome is mild but permanent. (Id.).

Plaintiff saw Christopher J. Maglio, Ph.D., Licensed Psychologist, for a psychological consultation with testing on January 19, 2010. (Tr. 230-35). Plaintiff reported that his neck was "messed up," and that he was told to take a janitorial job, but he was not willing to take a pay cut. (Tr. 230). Plaintiff reported that he has problems with his temper, and that he tries not to be around people because he can become violent. (Tr. 231). Plaintiff also reported that he has experienced depression due to his pain and his inability to do the things he wants to do. (Id.).

---

[7]Disorder of the spinal nerve roots. Stedman's at 1622.

Plaintiff indicated that he has been self-medicating with alcohol and marijuana. (Id.). Upon mental status examination, plaintiff's mood was stable, and his affect modulated appropriately. (Tr. 231). Plaintiff spoke at a normal pace, responded appropriately to direct questions, and spoke in an understandable manner. (Id.). Plaintiff's thought process was logical, the form and content of his expressed thought was appropriate, and he showed no indications of a thought disorder. (Id.). Plaintiff's attention and concentration both appeared normal. (Id.). Plaintiff refused to attempt to serially subtract by threes and sevens stating "I can't do that." (Id.). Plaintiff accurately followed simple three-step verbal instructions and requests without hesitation, however he reported not being able to read and understand the present three-step written instructions. (Id.). Plaintiff's recent memory capabilities were such that he was able to remember two of three stated common objects over a five-minute period; and his remote memory abilities were such that he was able to accurately name the current president and two of the previous four presidents. (Id.). Plaintiff appeared to have a normal fund of information. (Id.). Plaintiff demonstrated good judgment in his responses to common situations; and appeared to have poor insight into his own difficulties. (Tr. 231-32). Dr. Maglio administered the Wechsler Adult Intelligence Test-Fourth Edition (WAIS-IV), which revealed a verbal comprehension score of 66, perceptual reasoning score of 81, working memory score of 74, processing speed of 56, and full scale IQ of 65. (Tr. 232). Dr. Maglio stated that plaintiff's "unique set of thinking and reasoning abilities make his overall intellectual functioning difficult to summarize by a single score" on the WAIS-IV. (Id.). Dr. Maglio noted that plaintiff's nonverbal reasoning abilities are much better developed than his verbal reasoning abilities. (Id.). Plaintiff's strength was processing complex visual information by forming spatial images of part-whole relationships and/or by manipulating

the parts to solve novel problems without using words.  (Id.).  Making sense of complex verbal

information and using verbal abilities to solve novel problems were less developed abilities.  (Id.).

Plaintiff's reasoning abilities on verbal tasks are generally in the extremely low range, while his

nonverbal reasoning abilities are significantly higher and in the low average range.  (Tr. 235).

Plaintiff's ability to sustain attention, concentrate, and exert mental control is in the borderline

range, and his ability in processing simple or routine visual material without making errors is in

the extremely low range when compared to his peers.  (Id.).  Dr. Maglio stated that plaintiff may

experience difficulty in keeping up with his peers in a wide variety of situations that require

thinking and reasoning abilities based on his scores.  (Id.).  Dr. Maglio diagnosed plaintiff with

alcohol abuse, cannabis abuse, adjustment disorder[8] with depressed mood, impulse control

disorder, mild mental retardation, and  a GAF score of 45.[9]  (Tr. 234).  Dr. Maglio stated that

plaintiff is having difficulties with anger and impulse control problems as well as mild depression

and interpersonal problems in getting along with others subsequent to his reported chronic pain

and his reported inability to perform the only type of work he feels qualified to do.  (Id.).  Dr.

Maglio recommended a referral to Vocational Rehabilitation.  (Id.).  Dr. Maglio stated that

plaintiff showed no difficulties in his ability to understand and follow through with simple verbal

instructions but he had difficulty responding to written instructions until they were read and

explained to him.  (Id.).  Plaintiff evidenced no difficulties with maintaining and/or sustaining

---

[8]A disorder the essential feature of which is a maladaptive reaction to an identifiable
psychological stress, or stressors, that occurs within weeks of the onset of the stressors and
persists for as long as six months.  Stedman's at 567.

[9]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in
social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at
32.

concentration and/or attention, however he reported significant difficulties socially interacting at work.  (Id.).  Plaintiff appeared able to persist in work related tasks and he showed no indications that he would have difficulties appropriately adapting to varying work environments.  (Id.).  Dr. Maglio concluded that, "[o]verall, [plaintiff] did not demonstrate psychological difficulties that when appropriately treated would interfere with his ability to maintain gainful employment in an employment setting appropriately accommodating to his true physical limitation as well as his intellectual needs."  (Id.).

Mark Altomari, Ph.D completed a Psychiatric Review Technique on February 17, 2010, in which he expressed the opinion that plaintiff had mild limitations in his activities of daily living, ability to maintain social functioning, and his ability to maintain concentration, persistence or pace.  (Tr. 244).  Dr. Altomari acknowledged plaintiff's recent full scale IQ of 65, but stated that plaintiff "is not retarded, however, as he does not have adaptive deficits commensurate with his Verbal IQ, and he has a long history of SGA work.  He appears to be LD, and he functions at the level of his Performance IQ."  (Tr. 246).

Dr. Altomari also completed a Mental Residual Functional Capacity Assessment, in which he expressed the opinion that plaintiff was moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting.  (Tr. 247-48).  Dr. Altomari stated that plaintiff has the ability to understand, remember and carry out short and simple instructions as long as they are oral.  (Tr. 249).  Dr. Altomari found that plaintiff can relate appropriately to co-workers and supervisors, but he tends to be irritable, so

occupations which heavily require social interactions should be avoided.  (Id.).  Dr. Altomari stated that plaintiff can adapt to most usual changes common to a competitive work environment, and he can make simple work-related decisions.  (Id.).  Dr. Altomari stated that, from a psychological point of view, plaintiff is not significantly different from when he was working, with the exception of an untreated adjustment disorder, which is apparently a reaction to his physical condition.  (Id.).  On March 12, 2010, Stephen Kleinman, M.D. completed a Medical Consultant's Review of Psychiatric Review Technique Form, in which he indicated that he agreed with the findings of Dr. Altomari.  (Tr. 250-54).

Plaintiff presented to Rick Bonnette, D.O. at Family Health Center of Boone County on July 9, 2010, at which time he requested a prescription of Valium for ongoing neck, back, and shoulder pain.  (Tr. 257).  Plaintiff indicated that he had taken some of his wife's Valium, and it seemed to work well.  (Id.).  Plaintiff also requested a note stating that was unable to work so he could get disability benefits.  (Id.).  Upon examination, plaintiff had some slight restriction in extreme rotation in either direction of the neck, and some tightness into the trapezius muscles bilaterally.  (Id.).  Plaintiff had fairly good mobility of the shoulders.  (Id.).  Plaintiff's straight leg raising was negative and his neurologic exam was intact and symmetrical.  (Id.).  Dr. Bonnette's assessment was history of neck pain, muscle spasms; and history of degenerative cervical disc disease.  (Id.).  Dr. Bonnette stated that he was not sure what to do with plaintiff, and that there seemed to be some concern over controlled medication use.  (Id.).  Dr. Bonnette stated that he preferred that plaintiff continue to see his doctors in Columbia.  (Id.).  He gave plaintiff a note excusing him from work for two weeks, and recommended that he follow-up with his regular doctors.  (Id.).

Plaintiff presented to Dr. Carmignani on October 20, 2010, with complaints of back and neck pain. (Tr. 258). Plaintiff reported that he used one-half of a can of chewing tobacco a day, and drank approximately six beers a day. (Tr. 259). Smoking cessation was discussed. (Id.).

Plaintiff presented to Dr. Bonnette on December 7, 2010, with complaints of neck and back pain. (Tr. 261). Plaintiff reported that he had been seeing other doctors at Family Health Center in Columbia, and that one of his doctors is retiring. (Id.). Plaintiff requested pain medication and a note to qualify for food stamps. (Id.). Plaintiff indicated that he used to work in construction doing sheetrock, and that he "seldom works at this time." (Id.). Upon examination, plaintiff had diminished neck mobility in left rotation, some slight arthritic crepitus, some tenderness in the posterior neck muscles, mild diminished mobility to the right, pain with flexion and extension, soreness into both shoulders, and weak grip strength bilaterally. (Id.). Plaintiff's lower extremity reflexes were intact, his straight leg raise test was somewhat positive at ninety degrees bilaterally, his back revealed some discomfort throughout the lumbar spine and there was some tightness in the lumbar paraspinal muscles. (Id.). Dr. Bonnette's assessment was chronic neck and back pain, and degenerative lumbar disc disease of the cervical and lumbar spine. (Id.). Dr. Bonnette restarted plaintiff's Vicodin and refilled his Amitriptyline. (Id.). Dr. Bonnette indicated that he wrote a note stating that plaintiff was unable to work at this time due to his neck and back pain. (Id.). Dr. Bonnette stated that he would recheck plaintiff in one to two months. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.    The claimant has not engaged in substantial gainful activity since June 4, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following "severe" physical and mental impairments: degenerative disc disease (DDD) of the cervical and thoracic spine, traumatic brain injury, borderline intellectual functioning, learning disorder, adjustment disorder, impulse control disorder, and alcohol and cannabis abuse (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform "light work," as defined in 20 CFR 404.1567(b) and 416.967(b), except the claimant can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; never climb ropes, ladders, or scaffolds; perform no work overhead; requires a sit/stand option every 30 minutes; only occasionally turn his head from side to side; understand, remember, and carry out only simple instructions; make only simple work related decisions; deal with only occasional changes in work processes and environment; have no contact with the general public; and, although no necessarily working in isolation, should certainly work with things rather than people, and, hence, should have only superficial, incidental work-related type contact with co-workers and supervisors.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on November 13, 1963 and was 45 years old, which is defined as a "younger individual age 18-49," on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has a "limited" level of education, as defined by the Regulations, and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Considering the claimant's above-stated residual functional capacity for only "unskilled" work, the claimant's acquired job skills do not transfer to other occupations within the residual functional capacity defined above (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 4, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-24).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on June 23, 2009, the claimant is not disabled under sections 216(I) and  223(d) of the Social Security Act.

Based on the application for supplemental security income protectively filed on March 23, 2010, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 25).


## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

**B.**      **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity"

determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the

determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.   Plaintiff's Claims

In his sole claim, plaintiff argues that the ALJ erred in finding that plaintiff did not meet Listing 12.05C, the listing for mental retardation.  Plaintiff does not challenge the ALJ's findings with regard to plaintiff's physical impairments or his other mental impairments.

"The claimant has the burden of proving that his impairment meets or equals a listing," Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir. 2010); and, "'[t]o meet a listing, an impairment

- 21 -

must meet all of the listing's specified criteria,'" id. (quoting Johnson v. Barnhart, 390 F.3d 1067,

1070 (8th Cir. 2004)).

Listing 12.05 provides as follows:

> 12.05 Mental Retardation: Mental retardation refers to significantly subaverage
> general intellectual functioning with deficits in adaptive functioning initially
> manifested during the developmental period; i.e., the evidence demonstrates or
> supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A,
> B, C, or D are satisfied.
>
> ***
>
> B.  A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a
> physical
> or other mental impairment imposing an additional and significant work-
> related limitation of function;

20 C.F.R. pt. 404, subpt. P, App. 1, § 12.05.

In addition, the overall introduction to the mental disorders section states:

> Listing 12.05 contains an introductory paragraph with the diagnostic description for
> mental retardation.  It also contains four sets of criteria (paragraphs A through D).  If your
> impairment satisfies the diagnostic description in the introductory paragraph and any one
> of the four sets of criteria, we will find that your impairment meets the listing.

Id. at § 12.00.

The Eighth Circuit has held that the requirements in the introductory paragraph of Listing

12.05-the diagnostic description of mental retardation-are mandatory.  Maresh v. Barnhart, 438

F.3d 897, 899 (8th Cir. 2006).  Thus, in order to qualify as mentally retarded under Listing

12.05C, plaintiff was required to show: (1) significantly subaverage general intellectual

functioning with deficits in adaptive functioning, (2) an onset of that impairment prior to age

- 22 -

twenty-two, (3) a valid IQ score between 60 and 70, and (4) an additional impairment imposing a significant work-related limitation of function.  See Cheatum v. Astrue, 388 Fed. Appx. 574, 576 (8th Cir. 2010) (holding that a claimant must prove deficits in adaptive functioning in addition to the elements of paragraph C); Maresh, 438 F.3d at 899.

In this case, the ALJ found that plaintiff failed to meet the criteria for mental retardation because he did not demonstrate the required deficits in adaptive functioning.  (Tr. 20).  The ALJ's determination is supported by substantial evidence.

The ALJ acknowledged that plaintiff's IQ scores placed him within the range of Listing 12.05C.  The ALJ noted that plaintiff was administered the Wechsler Intelligence Scale for Children at the age of eleven, which revealed a verbal IQ of 75, performance IQ of 69, and full scale IQ of 70.  (Tr. 19, 200).  It was noted that these scores placed plaintiff in the "educable mentally retarded range."  (Id.).  Plaintiff was placed in special education classes, and attended school until the eighth grade.  (Id.).

The ALJ noted that, as an adult, plaintiff was administered the Wechsler Adult Intelligence Test-Fourth Addition (WAIS-IV) by Dr. Maglio in January 2010, which revealed a full verbal comprehension score of 66, perceptual reasoning score of 81, working memory score of 74, processing speed score of 56, and full scale IQ score of 65.  (Tr. 20, 232).  The ALJ pointed to Dr. Maglio's finding that plaintiff's "unique set of thinking and reasoning abilities" made his overall intellectual functioning difficult to summarize by a single score on the WAIS-IV.  (Tr. 20, 232).  Dr. Maglio indicated that plaintiff's nonverbal reasoning abilities are much better developed than his verbal reasoning abilities, and his ability to sustain attention, concentrate, and exert mental control was in the borderline range.  (Tr. 20, 232, 235).  Dr. Maglio concluded that

plaintiff had no difficulty in maintaining or sustaining concentration or attention, he could adapt to varying work environments and he did not demonstrate psychological difficulties that when appropriately treated would interfere with his ability to maintain gainful employment in an employment setting appropriately accommodating his physical limitations and intellectual needs. (Tr. 20, 234).

The ALJ found that plaintiff does not meet the criteria for mental retardation because he does not have adaptive deficits commensurate with his verbal IQ, and he has a long history of performing sustained work activity at substantial gainful activity level at the skilled (SVP 7) level. (Tr. 20).  The ALJ stated that it appears from the record that plaintiff has a learning disorder and that he functions at the level of his performance IQ.  (Id.).  The ALJ stated that plaintiff has not demonstrated significant deficits in adaptive functioning because he has a long history of performing skilled work at substantial gainful activity.  (Id.).  The ALJ also noted that plaintiff drives, and that he ran his own business.  (Tr. 20, 47, 264).

Plaintiff contends that the ALJ erred in finding that plaintiff did not meet Listing 12.05C based on his ability to perform substantial gainful activity.  Plaintiff is correct that his ability to perform gainful activity is not relevant if he otherwise meets the requirements of Listing 12.05. Cheatum, 388 Fed. Appx. at 577 n. 3 (citing Maresh, 438 F.3d at 901).  Plaintiff's ability to perform gainful activity is relevant, however, to whether he has demonstrated the deficits in adaptive functioning necessary to meet that listing.  Id.

As the ALJ noted, plaintiff's ability to perform skilled work for approximately thirty years is not consistent with mental retardation.  See Cheatum, 388 Fed. Appx. at 577 (ability to maintain employment in semi-skilled and unskilled positions for many years considered as a factor

- 24 -

inconsistent with mental retardation); Hines v. Astrue, 317 Fed. Appx. 576, 579 (8th Cir. 2009)

(ability to perform semi-skilled job considered as a factor inconsistent with mental retardation).  In

addition, plaintiff's abilities to manage a business, drive a car, care for himself, perform chores,

and count change are likewise inconsistent with mental retardation.  See Clark v. Apfel, 141 F.3d

1253, 1255-56 (8th Cir. 1998) (ALJ properly rejected low IQ scores where scores were product

of one meeting with non-treating psychologist and were inconsistent with claimant's daily

activities, including reading, writing, counting money, driving, cooking, cleaning, shopping, and

taking care of young child).  The undersigned further notes that the ALJ's determination is

consistent with the opinion of state agency psychologist Dr. Altomari.  Dr. Altomari

acknowledged plaintiff's recent full scale IQ of 65, but stated that plaintiff is not mentally

retarded, however, as "he does not have adaptive deficits commensurate with his Verbal IQ, and

he has a long history of SGA work.  He appears to be LD, and he functions at the level of his

Performance IQ."  (Tr. 246).

      Plaintiff also contends that the ALJ erred in relying on the testimony of the vocational

expert to find that plaintiff's work activity was at the skilled level.  Plaintiff argues that, while the

vocational expert described plaintiff's past work as "drywall finisher, which is skilled and has an

SVP of 7, plaintiff's past work is properly described as "taper," which is skilled and has an SVP

of 5.

      Plaintiff's argument lacks merit.  As defendant points out, the terms "drywall finisher" and

"taper" are different terms used for the same position.  See Dictionary of Occupational Titles

("DOT") 842.664-010 (listing "dry-wall finisher" as an alternate title for "taper").  The DOT

indicates that this position has a Specific Vocational Preparation ("SVP") of 5.  Id.  The ALJ,

- 25 -

however, relied on the testimony of the vocational expert that plaintiff's past work was performed at an SVP level of 7.  (Tr. 53).

Regardless of whether plaintiff's past work was performed at an SVP level of 5 or 7, it is undisputed that plaintiff's past work was skilled.  See SSR 00-4p (skilled work corresponds to an SVP of 5-9 in the DOT).  Thus, the ALJ did not err in considering plaintiff's ability to continuously perform skilled work at substantial gainful activity levels in determining plaintiff's level of adaptive functioning.

After properly finding that plaintiff's condition did not meet Listing 12.05C, the ALJ proceeded with the sequential analysis.  The ALJ found that plaintiff had the RFC to perform light work, except that plaintiff can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; never climb ropes, ladders, or scaffolds; perform no work overhead; requires a sit/stand option every 30 minutes; only occasionally turn his head from side to side; understand, remember, and carry out only simple instructions; make only simple work related decisions; deal with only occasional changes in work processes and environment; have no contact with the general public; and, although no necessarily working in isolation, should certainly work with things rather than people, and, hence, should have only superficial, incidental work-related type contact with co-workers and supervisors.  The ALJ's RFC determination is supported by the record as a whole, including the medical opinion evidence.  The hypothetical posed to the vocational expert was consistent with the ALJ's RFC determination.  The vocational expert testified that a hypothetical claimant could perform work as in inserting machine operator, folding machine operator, or collator operator.  (Tr. 54-56).  Thus, the ALJ's decision finding plaintiff was not disabled is supported by substantial evidence.

**<u>Conclusion</u>**

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment.  Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this <u>20th</u> day of March, 2013.

*Lewis M. Blanton*

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE